**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 3:15-cr-00076-SRU |
| v. | |
| UBS AG, | JOINT SENTENCING MEMORANDUM |
| Defendant. | |

The defendant, UBS AG ("UBS"), and the Government jointly submit this memorandum in advance of the sentencing scheduled for November 29, 2016. For the reasons set forth below, the parties respectfully submit that the sentence set forth in the plea agreement, which has been presented to the Court for its consideration pursuant to Rule 11(c)(1)(C), is appropriate and in accordance with the requirements of 18 U.S.C. § 3553(a). The parties therefore request that the Court accept the plea agreement and impose a sentence that is consistent with the agreement's terms.

## I.   PRELIMINARY STATEMENT

UBS is a financial services corporation with headquarters located in Basel and Zurich, Switzerland. UBS has banking divisions and subsidiaries around the world, including in the United States. One of its divisions is the Investment Bank, which operates through a number of legal entities. These entities include UBS Securities Japan Co., Ltd. ("UBSSJ"), which is a wholly owned subsidiary of UBS that engages in investment banking and wealth management. UBS employs derivatives traders around the world—including in New York, London, Zurich, and Tokyo—who trade financial instruments tied to the London Interbank Offered Rate ("LIBOR"), the Euro Interbank Offered Rate ("Euribor"), and the Euroyen Tokyo Interbank Offered Rate

1

("TIBOR").  These benchmark rates are calculated daily based on the submissions of selected panel banks, including UBS.

Between approximately 2001 and June 2010, certain UBS derivatives traders engaged in a scheme to manipulate published LIBOR, Euribor, and Euroyen TIBOR rates to benefit their trading positions by seeking favorable adjustments to UBS's LIBOR, Euribor, and Euroyen TIBOR submissions, as well as the submissions of other panel banks.  Plea Agreement Ex. 3 ¶ 20, May 20, 2015, ECF No. 2 [hereinafter "Plea Ag."].  This conduct is described in greater detail at page 16 below.  UBS accepts responsibility for the misconduct of these employees.  *See, e.g.*, *id.* ¶ 134.

On December 18, 2012, UBS and the Fraud Section of the U.S. Department of Justice's Criminal Division (the "Department") reached a resolution in the benchmark interest rate investigation.  Pursuant to this resolution, UBS and the Department entered the NPA and UBS agreed to pay a $500 million fine.  *Id.* at 1.  Under the terms of the NPA, UBS agreed not to commit any further violations of United States criminal law for two years.  *Id.* at 3.  UBS also agreed to: admit, accept, and acknowledge responsibility for certain misconduct related to the benchmark rates; cooperate fully with the Department's ongoing investigation; disclose certain criminal violations to the Department; and report certain criminal or regulatory investigations or proceedings to the Department.  *Id.* at 1, 3, 5 (requiring UBS to "bring to the Fraud Section's attention all potentially criminal conduct by UBS or any of its employees that relates to violations of U.S. laws (i) concerning fraud…").  Finally, as part of the NPA, UBS further agreed that UBSSJ, its subsidiary in Japan where most of the misconduct relating to Yen LIBOR and Euroyen TIBOR occurred, would plead guilty to wire fraud and pay a $100 million fine (which was part of the $500 million UBS agreed to pay).  *Id.* at 1; Plea Agreement, *United States v. UBS Securities Japan Co.,*

*Ltd.*, No. 3:12-cr-00268 ¶¶ 1 (Dec. 19, 2012) [hereinafter "UBSSJ Plea Ag."] ¶¶ 1, 10.  UBSSJ was sentenced by Judge Chatigny on September 18, 2013, and ordered to pay a fine of $100 million.  *See* Judgment, *United States v. UBS Securities Japan Co., Ltd.*, No. 3:12-cr-00268 (Sept. 18, 2013).  In addition to these resolutions with the Criminal Division, in 2012, UBS resolved civil and regulatory actions brought against it and its subsidiary, UBSSJ, by enforcement authorities and regulators in the United States, the United Kingdom, and Switzerland relating to UBS's submissions of various benchmark rates.

Starting in September 2013, UBS reported to the Department, as required by the terms of the NPA, that its employees had engaged in potential misconduct in the foreign exchange ("FX") market.  The Department later determined that such conduct violated the provision of the NPA that prohibited UBS from committing violations of United States criminal law during its pendency.  *Id.* After the Department determined that UBS had breached its NPA, UBS agreed to plead guilty for the conduct described in the NPA relating to benchmark manipulation.  On May 20, 2015, UBS pleaded guilty, pursuant to a Rule 11(c)(1)(C) plea agreement (the "Plea Agreement"), to an Information filed by the Criminal Division of the Department charging UBS with one count of wire fraud, 18 U.S.C. §§ 1343 and 2, relating to this LIBOR, Euribor, and Euroyen TIBOR misconduct.  *See id.* ¶ 1.

To date, and not including any fine imposed by this court, UBS has paid more than $1.5 billion in penalties, fines, and disgorgement in connection with employees of UBS and UBSSJ engaging in a scheme to manipulate certain benchmark rates.  Prior resolutions with law enforcement and regulatory agencies have also required UBS to adopt stringent internal controls and compliance measures to prevent and detect any possible misconduct in the future.  The parties

respectfully ask the Court to consider the Plea Agreement and proposed fine in the context of these prior resolutions.

The following sections briefly summarize: (1) the interest rate benchmark investigation and resulting NPA and related resolutions; (2) the FX investigation and the decision by the Department to breach the NPA; and (3) the Plea Agreement.

### A.     The LIBOR Investigation and Resulting Resolutions

For UBS, the global investigation relating to benchmark interest rate submissions began with a request by the CFTC in 2008 regarding potential U.S. Dollar LIBOR manipulation.  While cooperating with this investigation, UBS discovered evidence of potential collusion involving Yen LIBOR and self-disclosed the conduct to the Department and multiple other authorities in the United States, Asia, Europe, and the United Kingdom. *See* UBS AG Non-Prosecution Agreement, U.S. Dep't of Justice at 1 (Dec. 18, 2012) [hereinafter "NPA"] ("Although UBS was not the first bank to provide the Fraud Section with helpful information, and its self-disclosure and cooperation commenced after the Fraud Section had obtained certain evidence implicating UBS . . . UBS made its self-disclosure before the Fraud Section had contacted UBS regarding the criminal investigation.")

UBS's discovery and self-disclosure of this potential Yen LIBOR conduct significantly expanded the Department's investigation—and investigations by other authorities—into potential misconduct relating to benchmark interest rate submissions.  During this investigation, UBS identified additional conduct relating to Euribor and Euroyen TIBOR, which it subsequently self-disclosed to the Department and other government authorities.  At the time, the Criminal Division recognized the "positive changes" that UBS had made "under its new senior leadership."  *Id.*

UBS's cooperation with the Department and other authorities throughout the investigation was, as described by the Department, "exceptional."  *Id.* at 2.  Among other things, UBS reviewed

millions of documents that had been collected from Australia, Hong Kong, Japan, Singapore, Switzerland, the United Kingdom, and the United States and produced over one million documents to the Department alone as part of the investigation.  In addition, UBS's attorneys conducted interviews of scores of witnesses in Australia, France, Germany, Hong Kong, Japan, Singapore, Switzerland, the United Kingdom, and the United States; thereafter, UBS provided numerous witness proffers, most of which were given within days or weeks of the interviews, and facilitated many employees' cooperation with and interviews by the Department.  Further, UBS held dozens of in-person and telephonic meetings with the Department during which UBS provided oral updates on the investigation, gave in-depth overviews of the evidence found to date, or discussed specific questions or requests for information from the Department.

As the Department acknowledged, UBS "provided highly valuable information that significantly expanded and advanced the criminal investigation."  *Id.*  Indeed, information provided by UBS contributed substantially to prosecutions of other financial institutions, namely RBS plc and Deutsche Bank AG, which entered into deferred prosecution agreements ("DPAs") with the Department, as well as guilty pleas by RBS and Deutsche Bank subsidiaries relating to their roles in manipulating various benchmark interest rates that included Yen LIBOR.  *See* Press Release, Deutsche Bank's London Subsidiary Agrees to Plead Guilty in Connection with Long-Running Manipulation of LIBOR, U.S. Dep't of Justice (Apr. 23, 2015), *available at* https://www.justice.gov/opa/pr/deutsche-banks-london-subsidiary-agrees-plead-guilty-connection-long-running-manipulation; Press Release, RBS Securities Japan Limited Agrees to Plead Guilty in Connection with Long-Running Manipulation of LIBOR Benchmark Interest Rates, U.S. Dep't of Justice (Feb. 6, 2013), *available at* https://www.justice.gov/opa/pr/rbs-

securities-japan-limited-agrees-plead-guilty-connection-long-running-manipulation-libor.[1]      In total, global resolutions with these financial institutions resulted in more than $4.1 billion in penalties and disgorgements—of which approximately $1.2 billion was imposed by the Department alone.

The information that UBS provided also led or contributed to prosecutions in the United States and United Kingdom of traders and brokers who participated in the manipulation of different benchmark interest rates.  For example, on December 12, 2012, the Department filed a criminal complaint against former UBS traders Tom Alexander William Hayes and Roger Darin in the Southern District of New York.  Complaint, *United States v. Hayes*, No. 1:12-mj-03229 (S.D.N.Y. Dec. 12, 2012).  Additionally, the U.K. Serious Fraud Office ("SFO") charged Mr. Hayes with eight counts of conspiracy to defraud; Mr. Hayes was convicted on all eight counts and is currently serving an 11-year prison sentence in the United Kingdom.  *LIBOR Yen (Hayes)*, U.K. SFO (May 12, 2016), https://www.sfo.gov.uk/cases/libor-hayes/.[2]      The Department also filed criminal charges against Colin Goodman, Daniel Wilkinson and Darrell Read—all former brokers at ICAP—for conspiring to manipulate LIBOR.  Complaint, *United States v. Read*, No. 1:13-mj-02224 (S.D.N.Y. Sept. 13, 2013), ECF No. 1.[3]  Thus, the information that UBS provided to the

---

[1]   UBS also provided information that assisted in the Department reaching a DPA with Rabobank for its role in manipulating benchmark interest rates, including Yen LIBOR.  *See* Press Release, Rabobank Admits Wrongdoing in LIBOR Investigation, Agrees to Pay $325 million in Criminal Penalty, U.S. Dep't of Justice (Oct. 29, 2013), *available at* https://www.justice.gov/opa/pr/rabobank-admits-wrongdoing-libor-investigation-agrees-pay-325-million-criminal-penalty.

[2]   Although Mr. Hayes was charged first in the Southern District of New York, he was prosecuted and convicted in the U.K. before appearing in U.S. District Court.  Following affirmance of his conviction on appeal, Mr. Hayes reportedly is now seeking further review in the U.K.'s Criminal Cases Review Commission.  *See* Chad Bray, *Tom Hayes Denied Latest Bid to Appeal Libor Conviction*, N.Y. Times, Mar. 8, 2016, *available at* http://www.nytimes.com/2016/03/09/business/dealbook/tom-hayes-denied-latest-bid-to-appeal-libor-conviction.html?_r=0.  The charges against Mr. Hayes in the Southern District of New York remain pending.  Similarly, Mr. Darin has never appeared in U.S. District Court and remains a fugitive.

[3]   These three individuals were prosecuted for the same conduct in the U.K. and acquitted following a jury trial.  On that basis, the Department moved to dismiss the complaint in the United States District Court for the Southern

Department and other authorities during the benchmark interest rate investigation led or contributed to significant corporate and individual prosecutions.

At the same time, UBS resolved related investigations into benchmark manipulation by other law enforcement and government agencies in the United States, the United Kingdom, and Switzerland.   In connection with these resolutions, UBS agreed to continue to implement remediation undertakings and compliance measures to improve its systems and controls and strengthen its compliance program.   For instance, the U.S. Commodity Futures Trading Commission ("CFTC") concluded that UBS and UBSSJ violated Sections 6(c), 6(d) and 9(a)(2) of the Commodity Exchange Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2).   *See In the Matter of UBS AG and UBS Securities Japan Co., Ltd.*, CFTC Docket No. 1309 (Dec. 19, 2012).   UBS and UBSSJ submitted an Offer of Settlement to the CFTC on December 18, 2012, to resolve the ongoing investigation and the CFTC adopted an Order accepting the Offer of Settlement the following day. Pursuant to the CFTC's Order, UBS and UBSSJ agreed to: (1) pay a $700 million civil penalty; and (2) implement a detailed compliance program to ensure the integrity and reliability of UBS's future benchmark interest rate submissions.   *See id.* at 59–71.

In addition, the U.K. Financial Services Authority ("FSA") ultimately concluded that UBS's conduct breached requirements that UBS use reasonable care to organize and control affairs responsibly and effectively, with adequate risk management systems, and that UBS follow proper standards of market conduct.   *See Final Notice: UBS AG*, U.K. Fin. Serv. Auth. ¶ 5 (Dec. 19, 2012), *available at* www.fsa.gov.uk/static/pubs/final/ubs.pdf.   UBS agreed to the terms of a settlement with the FSA and, on December 19, 2012, the FSA adopted a Final Notice imposing a

---

District of New York, and the court granted the motion.  Order Granting Motion to Dismiss, *United States v. Read*, No. 1:13-mj-02224 (S.D.N.Y. June 30, 2016), ECF No. 8.

financial penalty of £160 million (approximately $260.3 million) on UBS.  *See id.*  The Swiss Financial Market Supervisory Authority ("FINMA") also initiated supervisory proceedings against UBS and concluded that UBS violated Swiss financial market laws in its handling and supervision of benchmark rate submissions.  *See* Press Release, LIBOR: FINMA concludes proceedings against UBS and orders disgorgement of profits, FINMA (Dec. 19, 2012), *available at* https://www.finma.ch/en/news/2012/12/mm-ubs-libor-20121219.   On December 14, 2012, FINMA closed its proceedings with an Order that admonished UBS for its violations of Swiss financial market laws, required UBS to adopt certain remediation measures, and imposed disgorgement totaling CHF 59 million (approximately $64.7 million) on UBS.  *See id.*

Regulatory authorities in Japan also participated in the investigation and in late 2011, the Japanese Financial Services Authority ("JFSA") issued administrative actions against both UBS and UBSSJ that required the entities to implement compliance and preventative measures to prevent future misconduct and provide periodic reports.  The JFSA also prohibited UBSSJ from engaging in derivatives transactions related to LIBOR and Euroyen TIBOR for a one-week period. In 2012, following the JFSA's actions, the Tokyo Financial Futures Exchange and the Financial Futures Association also imposed monetary penalties on UBSSJ of JPY 10 million (approximately $100,000) and JPY 3 million (approximately $30,000), respectively.

**B.    The Foreign Exchange Investigation and Breach of the Non-Prosecution Agreement**

Following several of the benchmark interest rate settlements, in June 2013 articles came out suggesting that FX traders at banks with a significant presence in the FX market had been colluding in certain FX markets to enhance their profits on fixing orders for FX benchmark rates. Although the articles did not implicate UBS directly, they referenced UBS's and other banks' substantial FX market shares. UBS took these allegations seriously and launched an internal

investigation.  In September 2013, UBS uncovered evidence of potential collusion involving numerous other banks and immediately reported the conduct to the Department, as it was required to do under the terms of the NPA.  Indeed, UBS attorneys disclosed the conduct within days of discovering potential collusion and disclosed the conduct to the Department in advance of the Sentencing hearing for UBSSJ on September 18, 2013.  UBS also reported the conduct to numerous other authorities in the United States, United Kingdom, Europe, Asia, and elsewhere.

After the initial discovery and disclosure, as required by the NPA, UBS cooperated extensively with the Department throughout the investigation that ensued.  In the disposition that the parties ultimately reached, which is currently before the Court, the Department again recognized the scope and value of UBS's cooperation:

> UBS's cooperation in the Department's investigation of criminal conduct in connection with the foreign exchange market . . . included, but was not limited to, commencing an internal investigation, reporting the conduct to the Department, assisting and facilitating interviews of current and former UBS employees in the United States and abroad, frequent communication with the Department, and disclosing many of the facts set forth in Exhibit 1.

Plea Ag. ¶ 19(a).  Indeed, among other things, UBS: conducted scores of significant in-person or telephonic meetings with the Department, wherein UBS provided updates and proffered on the evidence; made dozens of multi-hour evidentiary presentations that synthesized factual information and transactional analysis; and provided scores of detailed witness proffers. Moreover, UBS facilitated numerous interviews by the Department of current and former UBS employees.  In addition, UBS responded to hundreds of separate requests for information or documents from the Department's investigation team.  Many of these requests were made on short notice, and UBS responded quickly, including over weekends and holidays.  UBS also made more than 300 separate document productions, consisting of documents sourced from Switzerland, the United Kingdom, the United States, and produced trading records for millions of transactions.

As in the interest rate benchmark investigation, the information provided by UBS in the FX investigation led to prosecutions of several other financial institutions.  *See* Press Release, Five Major Banks Agree to Parent-Level Guilty Pleas, U.S. Dep't of Justice (May 20, 2015), *available at*  https://www.justice.gov/opa/pr/five-major-banks-agree-parent-level-guilty-pleas  [hereinafter "FX Press Release"].  On the same day that UBS and the Criminal Division entered the Plea Agreement, parent entities of four other financial institutions—Barclays PLC, Citicorp, JP Morgan Chase & Co., and The Royal Bank of Scotland plc—agreed to plead guilty to conspiring to manipulate the Euro-U.S. Dollar FX Spot Market.  *See id.*  Thus, the Department criminally charged four other financial institutions and imposed more than $2.5 billion in fines on these institutions as follows: Barclays PLC agreed to pay a fine of $650 million; Citicorp agreed to pay a fine of $925 million; JP Morgan Chase agreed to pay a fine of $550 million; and The Royal Bank of Scotland plc agreed to pay a fine of $395 million.  *Id.*

The Department determined that certain conduct that UBS reported to it—and that began well before the signing of the NPA—continued past the NPA date.  *Id.* ¶ 2(a).  This conduct included: (1) certain "fraudulent and deceptive currency trading and sales practices in conducting certain [FX] market transactions with customers via telephone, email, and/or electronic chat"; and (2) "collusion with other participants in certain FX markets."  Plea Ag. Ex. 1 ¶¶ 2(a), 11–15.  As a result of this conduct, which breached UBS's agreement in the NPA to "commit no United States crime whatsoever" for a period of two years, and due to UBS's prior civil and criminal resolutions and the failure of UBS's compliance programs to detect the FX conduct, DOJ exercised its discretion to declare a breach of the NPA.  *See* Plea Ag. ¶ 1; Plea Ag. Ex. 1 ¶¶ 1, 2(a).  The Department revoked UBS's NPA and charged UBS with the instant offense.  *See* FX Press Release.

Notably, and unlike the other financial institutions involved, UBS was not charged for any FX-related conduct.

### C.    The Plea Agreement

On May 20, 2015, UBS entered the Plea Agreement with the Department that is the subject of this current disposition.  Pursuant to the Plea Agreement, UBS pleaded guilty to one count of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2, in connection with UBS's submission of Yen LIBOR and other benchmark interest rates between 2001 and 2010.  Plea Ag. ¶ 1.  Under the terms of the Plea Agreement, in addition to pleading guilty, UBS agreed to a criminal fine of $203 million and a three-year term of probation.  *See* Plea Ag. ¶ 19.  During that term of probation, among other things, UBS agreed to cooperate fully with the Department and other law enforcement and government agencies in "any investigation of UBS, its affiliates or subsidiaries, or any of its present or former officers, directors, employees, agents, and consultants, or any other party" in a range of matters.  Id. ¶ 7.  These include:

> [M]atters relating to: (a) the manipulation of any benchmark interest rates; (b) manipulation of, or fraud in, the foreign exchange spot and precious metals markets, or in connection with UBS's V10 Currency Indices; and (c) violations of United States laws concerning fraud or governing securities or commodities markets, about which UBS has any knowledge and about which the Criminal Division shall inquire.

*Id.*  Further, as part of these cooperation obligations, UBS agreed to "truthfully disclose all factual information not protected by a valid claim of privilege or regulatory protection . . . including any evidence or allegations and internal or external investigations about which UBS has any knowledge and about which the Criminal Division may inquire."  *Id.*

Finally, the Plea Agreement requires that UBS continue to implement a comprehensive range of compliance and remediation measures.  *Id.* ¶ 20(c)(ii)–(iii).  These include an extensive series of directives and undertakings that were required under the terms of separate regulatory

dispositions with the U.S. CFTC, U.K. FCA, and FINMA.  *Id.* ¶ 20(c)(iii).  UBS must also submit to ongoing monitoring by and reporting to the Department and Probation Office regarding its progress in implementing these measures.  *Id.* ¶ 20(c)(ii)–(iii).

### D.    Related Civil Actions

Private plaintiffs have filed a number of civil actions against UBS in state and federal courts in the United States alleging misconduct with respect to various benchmark rates; these cases are now pending in the Southern District of New York.  *See, e.g.*, *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 1:11-md-002262-NRB (S.D.N.Y. transferred Aug. 21, 2011); *Salix Capital US Inc. v. Bank of Am. Sec. LLC*, No. 1:13-cv-04018-NRB (S.D.N.Y. filed June 12, 2013) (removed from Supreme Court of New York, County of New York, Case No. 651823-13).  The damages sought by these actions are significant and in certain cases include claims under the Sherman Act and RICO, which allow plaintiffs to seek treble damages.[4]  UBS has entered into an agreement to settle one of these cases and continues to defend itself in the others.

## II.    LEGAL STANDARD

Rule 11(c)(1)(C) authorizes the Government to enter into plea agreements with defendants in which the parties agree that a particular sentence is the appropriate disposition of the case.  *See* Fed R. Crim. P. 11(c)(1)(C).  The Court, however, "retains absolute discretion whether to accept a plea agreement."  Fed. R. Crim. P. 11 advisory committee's note to 1999 amendment.  As a plurality of the Supreme Court has observed:

---

[4]    In addition, there are also civil actions pending related to the FX conduct.  *See, e.g.*, *Baker v. Bank of America Corp.*, No. 1:16-cv-7512 (S.D.N.Y. filed Sept. 26, 2016); *Nypl v. JP Morgan Chase & Co.*, No. 1:15-cv-9300 (S.D.N.Y. filed May 21, 2015); *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, No. 1:13-cv-7789 (S.D.N.Y. filed Nov. 1, 2013).  UBS has entered into an agreement to settle one of these cases and continues to defend itself in the others.

> Federal sentencing law requires the district judge in every case to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of federal sentencing, in light of the Guidelines and other § 3553(a) factors. The Guidelines provide a framework or starting point—a basis, in the commonsense meaning of the term—for the judge's exercise of discretion. Rule 11(c)(1)(C) permits the defendant and the prosecutor to agree that a specific sentence is appropriate, but that agreement does not discharge the district court's independent obligation to exercise its discretion.

*Freeman v. United States*, 564 U.S. 522, 529 (2011) (plurality opinion) (internal citations and internal quotation marks omitted). In exercising that discretion, although the district court may accept or reject the proposed Rule 11(c)(1)(C) plea agreement, it may not modify the agreement's terms. *Id.*; *United States v. Green*, 595 F.3d 432, 438 (2d Cir. 2010) (citing *United States v. Cunavelis*, 969 F.2d 1419, 1422 (2d Cir. 1992)). Because "[t]he Guidelines provide a framework or starting point . . . for the judge's exercise of discretion[,]" the parties will first detail the applicable Sentencing Guidelines fine range in this matter. *See Freeman*, 564 U.S. at 529. The parties will then address the additional factors under § 3553(a) that are relevant to sentencing here.

## III.    THE RELEVANT CONSIDERATIONS UNDER SECTION 3553(a), INCLUDING THE SENTENCING GUIDELINES

### A.    The Applicable Sentencing Guidelines Fine Range

As set forth in the Presentence Report ("PSR"), the Probation Office has determined that the Sentencing Guidelines provide for a fine range of $101.5 million to $203 million.[5] Presentence Investigation Rep., Nov. 10, 2016, ECF No. 31 [hereinafter "PSR"]. This fine range is based upon the following calculation: a base offense level of seven, pursuant to U.S. Sentencing Guidelines Manual § 2B1.1(a), PSR ¶ 88; an increase of 26 levels, pursuant to U.S. Sentencing Guidelines Manual § 2B1.1(b)(1)(N), based on a loss amount of more than $150 million, PSR ¶ 89; an increase of two levels, pursuant to U.S. Sentencing Guidelines Manual § 2B(b)(2)(A), because the offense

---

[5]    The guideline calculation is based on the November 1, 2015 U.S. Sentencing Guidelines Manual. *See* PSR ¶ 86.

involved 10 or more victims, PSR ¶ 90; an increase of two levels, pursuant to U.S. Sentencing Guidelines Manual § 2B1.1(b)(10)(B)–(C), PSR ¶ 91; an increase of two levels, pursuant to U.S. Sentencing Guidelines Manual § 2B1.1(b)(16)(A), PSR ¶ 92; a base fine amount of $72.5 million, corresponding to an offense level of 38 or more, pursuant to the fine table set forth in U.S. Sentencing Guidelines Manual § 8C2.4(d), PSR ¶ 94[6]; a total culpability score of seven, based on the provisions of U.S. Sentencing Guidelines Manual § 8C2.5, PSR ¶¶ 95–102; and a resulting multiplier range of 1.40 to 2.80, pursuant to U.S. Sentencing Guidelines Manual § 8C2.7(a)–(b), PSR ¶ 103.  That multiplier, applied to the base fine range set forth in the fine table, produces a fine range of $101.5 million to $203 million.  PSR ¶¶ 103, 107.  The agreed-upon fine amount of $203 million, as set forth in the Plea Agreement, falls within the guideline range calculated in the PSR.

Neither party objects to the calculation of the guideline range contained in the PSR.[7] Moreover, neither party is advocating for a departure from that range, nor does the PSR identify any circumstances that would warrant a downward or upward departure.  PSR ¶ 110.  Finally, the

---

[6]   Under the fine table, a higher offense level would not produce a higher base fine, because the highest offense level listed is "38 or more," which corresponds to the highest listed fine amount of $72.5 million.  *See* U.S. Sentencing Guidelines Manual § 8C2.4(d) (2014).

[7]   As the PSR accurately states, although the parties do not object to the guideline calculation set forth in the report, the parties:

> [R]ecognize that based on the available evidence, the relevant guideline provisions, and the applicable legal standards, the Court could calculate the guideline range in other ways.  Accordingly, the Government and UBS would each reserve the right to challenge this calculation in a contested sentencing proceeding.  The parties anticipate that if such litigation were necessary, it would be protracted and would consume substantial resources.  The parties also agree that such proceedings would create significant litigation risk for each side and would undermine objectives of the agreed-upon dispositions that they have negotiated in this matter.

PSR ¶ 87.  As a result, although the parties are not posing any objection to the guideline calculation set forth in the PSR, each acknowledges that, at this time, it is not possible to take a final and definitive position regarding how the Guidelines should or would be applied following the extensive investigation and litigation that would occur as part of a contested sentencing process.

PSR states that the Probation Office is not aware of any factor that would warrant a sentence outside of the guideline range.  PSR ¶ 111.[8]

### B. The Nature and Circumstances of the Offense, the History and Characteristics of the Defendant, and the Need for the Sentence Imposed to Achieve the Purposes Set Forth in § 3553(a)(2)

In accordance with 18 U.S.C. § 3553(a), the Court's evaluation of the penalty proposed in the Plea Agreement should be based upon its consideration of, among other factors, the nature and circumstances of the offense, the prior history and characteristics of UBS, and the need for the sentence imposed to reflect the seriousness of that misconduct, to promote respect for the law, to provide for just punishment, to afford adequate deterrence, and to protect the public from any further crimes of the defendant.  18 U.S.C. § 3553(a)(1)–(2).  The parties submit that the proposed sentence contained in the Plea Agreement achieves those objectives.

### 1. The Nature and Circumstances of the Offense [§ 3553(a)(1)]

The nature and circumstances of the offense are discussed in considerable detail in the agreed-upon factual statements that form part of the Plea Agreement.  *See generally* Plea Ag. Ex. 1, Ex. 3.  The PSR also contains a summary of the relevant facts that is fully consistent with those statements.  PSR at ¶¶ 22–69.  In light of this existing record, the parties will not provide yet another comprehensive recitation of the relevant facts in this submission.  Instead, the parties will summarize the relevant offense conduct that is the subject of the Plea Agreement and highlight the unique circumstances of the current offense—in particular, the circumstances that resulted in UBS's current criminal prosecution.

The PSR provides the following overview of the defendant's offense conduct:

---

[8] Just as the parties recognize that the guideline range could be calculated in other ways, the parties recognize that, in a contested sentencing proceeding, both parties could advance arguments for a sentence outside the guideline range.  But as stated above, such a proceeding would be protracted and would undermine the objectives of the agreed-upon disposition.

> From as early as 2001 through at least June 2010, certain UBS derivatives traders requested and obtained benchmark interest-rate submissions which benefited their trading positions. These derivatives traders requested, and sometimes directed, that certain UBS LIBOR, Euroyen TIBOR, and Euribor submitters submit benchmark interest rate contributions that would benefit the traders' trading positions, rather than rates that complied with the definitions of LIBOR, Euroyen TIBOR and Euribor. Those derivatives traders either requested or directed a particular LIBOR, Euroyen TIBOR or Euribor contribution for a particular tenor and currency, or requested that the rate submitter contribute a rate higher, lower, or unchanged for a particular tenor and currency. . . . The LIBOR, Euroyen TIBOR, and Euribor submitters regularly agreed to accommodate the derivatives traders' requests and directions for favorable benchmark interest rate submissions.

PSR ¶ 42. More specifically, the Plea Agreement sets forth that "[b]eginning in 2006, in Zurich, Tokyo, and elsewhere, several UBS employees engaged in sustained, wide-ranging, and systematic efforts to manipulate Yen LIBOR and, to a lesser extent, Euroyen TIBOR, to benefit UBS's trading positions." Plea Ag. Ex. 3 ¶ 22. Additionally, the PSR details efforts by two UBS Yen derivatives traders to use cash brokers to manipulate Yen LIBOR submissions "by enlisting these brokers to disseminate misinformation to other Contributor Panel banks regarding Yen LIBOR" and "pass along Trader-1's requests to move Yen LIBOR submissions to benefit UBS's trading book." PSR ¶¶ 52, 56. This latter conduct occurred from at least 2007 and at various times through January 2010. *Id.* ¶ 52. Additional details and examples of such conduct are set forth both in Exhibit 3 to the Plea Agreement and the PSR. *See, e.g.*, Plea Ag. Ex. 3 ¶¶ 23–72 (Yen LIBOR and Euroyen TIBOR), 73–76 (Swiss Franc LIBOR), 77–82 (Pound Sterling LIBOR), 83–87 (Euribor), 88–90 (U.S. Dollar LIBOR); *see also* PSR ¶¶ 42–58.

The Plea Agreement and PSR also describe the significance of LIBOR and other interest rate benchmarks to the global financial system. Indeed, as those materials state, "[b]ecause of the widespread use of LIBOR in financial markets, this rate plays a fundamentally important role in financial systems around the world." PSR ¶ 33. For instance, "[t]he market for derivatives and other financial products linked to benchmark interest rates for the Yen is global and is one of the

largest and most active markets for such products in the world." *Id.* ¶ 43. As a result, a scheme to manipulate LIBOR or other interest rate benchmarks has widespread implications.

The parties fully recognize that the offense conduct at issue in this case is extremely serious. The severity of the conduct has never been in dispute. Indeed, UBS's response to the offense conduct, its acceptance of responsibility for this conduct in both December 2012 and May 2015, and the extensive compliance measures and remediation undertakings that UBS has implemented since the investigation all underscore UBS's acknowledgement of this factor and its appreciation for the seriousness of the offense. These actions also emphasize UBS's commitment to remediating and avoiding similar conduct in the future. For the Department, this factor represents a key reason that it decided to bring criminal charges against the defendant-company, notwithstanding the prior criminal conviction of UBSSJ. Thus, both sides appreciate the significance of this factor within the Court's sentencing analysis and have taken this into account when crafting an appropriate resolution.

## 2. The History and Characteristics of UBS [§ 3553(a)(1)]

Before the global benchmark rate investigation, UBS did not have any prior criminal convictions. As discussed above, however, on December 19, 2012, a subsidiary pled guilty to a one-count Information charging UBSSJ with engaging in a scheme between 2006 and 2009 to manipulate Yen benchmark interest rates, in violation of 18 U.S.C. §§ 1343 and 2. PSR ¶ 75. The UBSSJ Plea Agreement was part of a broader resolution between UBS and the Criminal Division in December 2012, which also involved the parties entering into the NPA relating to UBS's benchmark interest rate submissions. *See* PSR ¶ 74; NPA at 1.

In addition, UBS previously entered two separate criminal resolutions with the Department—unrelated to benchmark interest rates—although neither resulted in convictions. First, in February 2009, UBS entered into a DPA with the Department's Tax Division for

conspiring to defraud the United States of tax  revenue through secret Swiss bank accounts for United States taxpayers and agreed to pay a fine of $780 million.  PSR ¶ 74.  The conduct in this matter occurred prior to 2008.  *Id.*  In addition, in May 2011, UBS entered into an NPA with the Department's Antitrust Division  to resolve allegations of bid-rigging in the municipal bond derivatives market and agreed to pay a fine of $160 million.  *Id.*  The conduct in this matter occurred prior to 2007.  *Id.*  The fact that UBS's conduct in connection with FX markets constitutes its fourth matter involving the Department over the course of approximately six years was a relevant consideration in the Department's determination to declare a breach of the NPA.

The parties also submit that UBS's prior record of and ongoing commitment to cooperation should be considered in assessing whether the proposed penalty is sufficient under § 3553(a).  The Second Circuit has held that when considering the § 3553(a) factors, "a sentencing judge may take 'non-5K cooperation into account'" and may reduce a defendant's sentence because of that cooperation.  *United States v. Fernandez*, 443 F.3d 19, 34–35 (2d Cir. 2006).[9]  In reaching this conclusion, the Second Circuit reasoned that, given the broad wording of § 3553(a)'s requirement that a sentencing judge consider "the history and characteristics of the defendant," that "sweeping provision presumably includes the history of a defendant's cooperation and characteristics evidenced by cooperation, such as remorse or rehabilitation."  *Id.* at 33 (internal quotation marks omitted).  Although the parties are not advocating for a sentencing reduction here, UBS's record of cooperation with the Department reinforces the bank's acceptance of responsibility and its

---

[9]  Although *Fernandez* was abrogated by the Supreme Court's decision in *Rita v. United States*, that decision addressed "whether a court of appeals may afford a 'presumption of reasonableness' to a 'within-Guidelines' sentence," which the Second Circuit in *Fernandez* had not done.  551 U.S. 338, 346–47 (2007).  The Supreme Court concluded that courts of appeals may apply such a presumption of reasonableness to "within-Guidelines" sentence[s]."  *Id.* at 347.  Accordingly, the Second Circuit's holding in *Fernandez* regarding the consideration of a defendant's cooperation in determining an appropriate sentence under § 3553(a) remains valid.

commitment to rehabilitation and cultural transformation.  *See id.*  Therefore, it is relevant to the Court's assessment of the § 3553(a) factors and the appropriateness of the proposed sentence.

The PSR states that UBS "fully cooperated in the investigation and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct."  PSR ¶¶ 72, 101. Indeed, in both the benchmark interest rate investigation (which resulted in the initial UBSSJ conviction and NPA) and the FX investigation (which led to the NPA breach and the instant offense), UBS cooperated fully with the Department and disclosed valuable information, thereby assisting the Department in these complex, global investigations.  In the context of the initial benchmark interest rate investigation, the Criminal Division described UBS's cooperation as "exceptional" and "extensive," and it indicated that UBS's cooperation significantly expanded and advanced the criminal investigation.  *See* NPA at 2.  In the FX investigation, the Criminal Division again acknowledged the extent and value of UBS's cooperation, describing the specific steps UBS took to facilitate the Criminal Division's investigation and noting that UBS had disclosed many of the facts that were eventually used as a basis to breach the NPA between the parties.  *See* Plea Ag. ¶ 19(a).  UBS has thus demonstrated a commitment to and record of cooperation with the Department in both of the investigations that ultimately resulted in the current disposition.  This history of cooperation therefore merits the Court's consideration in assessing the proposed sentence here and concluding that it satisfies the requirements of § 3553(a).

**3.     The Need for the Sentence to Reflect the Seriousness of the Offense, to Promote Respect for the Law, to Provide Just Punishment, to Afford Adequate Deterrence, and to Protect the Public from Further Crime [§ 3553(a)(2)]**

The parties submit that the penalty proposed in the Plea Agreement is appropriate in light of the nature and seriousness of the offense conduct and also serves the purposes outlined in § 3553(a)(2)(A-C)—especially when viewed within the context of UBS's prior resolutions relating

to benchmark interest rate submissions.  In support of this position, and among other features of the Plea Agreement, the parties urge the Court to consider the following factors.

UBS has been required to plead guilty to a felony violation of U.S. law and therefore has accepted criminal responsibility for its conduct.  Indeed, this is the second occasion on which UBS or an affiliate has pleaded guilty to a felony resulting from UBS's benchmark interest rate submissions (and the conduct underlying both guilty pleas is substantially the same).  *Compare* Plea Ag. Ex. 3 *with* UBSSJ Plea Ag. Ex. 3, 4.  Criminal charges against financial institutions remain rare, especially—as is the case here—charges against the parent-level organization.  Thus, for UBS, which is a publicly traded, international financial institution participating in heavily regulated financial markets and banking activities around the world, criminal conviction gives rise to significant reputational risks and negative ramifications.  A conviction, for example, will harm the reputation of UBS and damage its relationships with current and future customers.  The conviction could further lead to a reduction in investor confidence and, because UBS is a significant player in global financial markets, could therefore increase uncertainty regarding its ability to operate effectively in those markets.

Similarly, in connection with the Plea Agreement, UBS has admitted the facts that constitute both the offense conduct and the basis for the NPA breach that precipitated the Plea Agreement.  Plea Ag. ¶¶ 10, 14.[10]  These admissions reflect both UBS's culpability and its acceptance of responsibility, and amplify the potential adverse consequences of the plea, as discussed above.  For example, acknowledging the relevant facts exposes UBS to heightened risks in civil litigation and other proceedings.

---

[10]   UBS has also agreed not to make any public statement contradicting those facts.  Plea Ag. ¶ 11.

The proposed sentence also includes a substantial financial penalty.  If the Plea Agreement is accepted, UBS will be required to pay a fine of $203 million.  *See* Plea Ag. ¶ 19.  That amount alone is significant; it will serve the goals of promoting respect for the law and providing for just punishment and effective deterrence.  However, that fine represents only one part of the total $703 million that UBS has agreed to pay as part of its December 2012 and May 2015 resolutions with the Department relating to benchmark interest rate submissions.  Moreover, because UBS previously resolved benchmark rate investigations with law enforcement and government agencies around the world, that fine should be viewed within the context of the cumulative penalties imposed on UBS and its subsidiaries.  Indeed, UBS has already paid more than $1.5 billion to resolve a series of investigations—all focusing, essentially, on the same underlying conduct—by regulatory and law enforcement agencies based in the United States, the United Kingdom, and Switzerland.  The Department was mindful of these prior resolutions in formulating its position regarding the fine and penalty payments set forth in the Plea Agreement.  Accordingly, the parties urge the Court to take all of the related dispositions into account in assessing the severity of the fine and ultimately considering whether to accept the proposed sentence in this case.

In addition to the $203 million fine, UBS will be subject to a three-year term of probation if the Court accepts the Plea Agreement.  *See id.*  The Plea Agreement therefore imposes not only substantial monetary penalties, but also significant cooperation and disclosure obligations on UBS during the three-year term of probation.  When viewed together with the extensive cooperation that UBS provided to the Department during the benchmark interest rate and FX investigations, these obligations further reinforce that the proposed sentence will promote respect for the law, provide just punishment, and afford adequate deterrence.  *See* § 3553(a)(2)(A)–(B).  Moreover,

they address the need for the sentence imposed to protect the public from the risk of future criminal conduct by the defendant. *See* § 3553(a)(2)(C).

Finally, the Plea Agreement requires UBS to "continue to implement a compliance program designed to prevent and detect, or otherwise remediate the conduct set forth in Exhibit 1 [FX conduct] and Exhibit 3 [interest rate benchmark conduct] throughout its operations" and to report annually on its progress to the Criminal Division and Probation Office. Plea Ag. ¶ 20(c)(ii). It also provides that UBS must comply with compliance and remediation undertakings that other U.S., U.K., and Swiss authorities separately imposed, and report upon these efforts to the Criminal Division and Probation Office. *Id.* at ¶ 20(c)(iii). These obligations—along with the combination of financial penalties, cooperation obligations, and disclosure requirements that the Plea Agreement also imposes—further serve to reflect the nature and seriousness of the offense conduct and to achieve the purposes set forth in § 3553(a)(2).

In light of these considerations, the parties submit that the sentence proposed in the Plea Agreement is in keeping with the factors set forth in § 3553(a)(1) and (a)(2).

**C.      Restitution [§ 3553(a)(7)]**

Section 3553(a)(7) instructs the Court to consider "the need to provide restitution to any victims of the offense" in crafting an appropriate sentence. Moreover, restitution in this type of case is generally required by the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A *et seq.* The parties are in agreement, however, that restitution should not be ordered in this case for the two reasons described in 18 U.S.C. § 3663A(c)(3). First, the number of potential victims in this case is so large as to make restitution impracticable. Although the parties may be able to identify counterparties to certain LIBOR-based transactions affected by the offense conduct, the task of identifying additional individuals or entities that could have been adversely affected by the manipulation of the various interest rate benchmarks would be so time consuming as to be

22

impracticable.  Second, determining the amount of money due to each identifiable victim would significantly complicate and prolong the sentencing process, potentially by years.  *See also* PSR ¶ 105 (noting that the parties "agree . . . determining complex issues of fact related to the cause or amount of restitution would complicate or prolong the sentencing process to agree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.")

## IV.    CONCLUSION

For the reasons set forth above, the parties jointly submit that the sentence set forth in the Plea Agreement is appropriate and in accordance with the requirements set forth in 18 U.S.C. § 3553(a).  The parties therefore respectfully request that the Court accept the Plea Agreement and impose a sentence that is consistent with the Agreement's terms.


Respectfully requested,


By:   ANDREW WEISSMANN                   By:   /s/ David P. Burns
      Chief, Fraud Section, Criminal Division       David P. Burns
      U.S. Department of Justice                     Federal Bar Number: phv05836
                                                     DBurns@gibsondunn.com

                                                     GIBSON, DUNN & CRUTCHER LLP
                                                     1050 Connecticut Avenue, N.W.
                                                     Washington, DC 20036-5303
                                                     Telephone: (202) 887-3786
By:   /s/ Gary Winters                              Fax: (202) 530-9637
      Gary Winters
      Trial Attorney, Fraud Section
      Criminal Division
      United States Department of Justice


Dated: November 23, 2016

## CERTIFICATE OF SERVICE

I hereby certify that on November 23, 2016, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.  Parties may access this filing through the Court's CM/ECF system.

A copy has further been forwarded to the United States Probation Office for the District of Connecticut via email.


By:  /s/ Gary Winters
    Gary Winters
    Trial Attorney, Fraud Section
    Criminal Division
    United States Department of Justice

By:  /s/ David P. Burns
    David P. Burns
    Federal Bar Number: phv05836
    DBurns@gibsondunn.com
    GIBSON, DUNN & CRUTCHER LLP
    1050 Connecticut Avenue, N.W.
    Washington, DC 20036-5303
    Telephone: (202) 887-3786
    Fax: (202) 530-9637


Dated: November 23, 2016